Charles W. Wright v. Commissioner.
Charles W. Wright v. Commissioner
Docket No. 15189.
United States Tax Court
1948 Tax Ct. Memo LEXIS 82; 7 T.C.M. (CCH) 738; T.C.M. (RIA) 48210; September 30, 1948
*82 William F. Knox, Esq., Oliver Bldg., Pittsburgh, Pa., and John F. Tim, Esq., Berger Bldg., Pittsburgh, Pa., for the petitioner. A. W. Dickinson, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This case involves income and victory taxes for the year 1943. A deficiency of $10,484 was determined by the Commissioner and the entire amount thereof is in dispute. The single question presented is whether the petitioner received a gift, or, on the contrary, compensation for past services rendered when on October 30, 1942, he received $19,500 from Standard Car Finance Corporation, hereinafter sometimes called Finance. (The year 1942 is involved because of the Current Tax Payment Act.) A stipulation of facts was filed, which we adopt by reference, finding the facts therein stipulated. They will be set forth here only in so far as regarded necessary to discussion of the issue, together with facts found from other evidence adduced in our Findings of Fact The petitioner's Federal income tax returns for the calendar years 1942 and 1943 were filed on a cash basis, with the collector at Pittsburgh, Pennsylvania. Prior to March 1, 1930, and *83 from about 1902 petitioner was employed by Steel Car Forge Company, a Pennsylvania corporation (hereinafter sometimes called Forge). He was secretary of that company from 1906 to 1923 and its vice-president thereafter. The company was a wholly-owned subsidiary of Standard Steel Car Company (hereinafter sometimes called Standard), which was a Pennsylvania corporation organized in 1902, engaged principally in the manufacture of railroad cars, having outstanding on March 1, 1930, 280,000 shares of capital stock of the par value of $100 per share. At the time of the termination of his employment with Steel Car Forge Company on February 28, 1930, petitioner was receiving a salary of $2,166.67 per month. He was paid such salary to March 1, 1930, receiving full payment for his services, and on March 1, 1930, Forge owed him nothing. After that date he rendered no services to Forge, Standard, or any of its stockholders. He was never employed by and never rendered any services to Standard Card Securities Company, hereinafter sometimes called Securities, or Standcar Securities Corporation, hereinafter sometimes called Standcar, or Standard Car Finance, hereinafter sometimes referred to as Finance. *84 Since March 1, 1930, he has been employed by the Pullman, Inc., interests, as follows: From March 1, 1930, to December 15, 1931, he was president of Steel Car Forge Corporation (not the same as Forge) and from December 16, 1931, to December 27, 1934, he was vicepresident of Standard Steel Car Corporation (not the same as Standard); from December 28, 1934, to August 16, 1944, he was vicepresident of Pullman Standard Car Manufacturing Company. Since August 17, 1944, he has been vice-president of that company and president of Pullman Standard Export Corporation. On October 30, 1942, Finance paid to petitioner the sum of $19,500. Petitioner in his income tax return for the calendar year 1942 disclosed the receipt of said amount but did not include it in his taxable income. In determining the deficiency respondent included in the taxable income of petitioner for the calendar year 1942 the $19,500, stating in his notice of deficiency in respect of this item "It is determined that the amount of $19,500.00 received by you in 1942 from Standard Car Finance Corporation constitutes taxable income to you in that year." About February 7, 1930, Standard transferred certain of its non-manufacturing *85 assets to Securities, which had been organized on January 24, 1930, for the purpose of receiving such assets for liquidation. The transferred assets included all of the 1,000 shares of stock in Standard's subsidiary Finance. Standard received from Securities and distributed to its stockholders 280,000 shares of stock in Securities. Wright had nothing to do with the transaction of setting up Securities. or the conferences, and received no information about it. Transfer to Securities was made subject to indebtedness, liabilities, and obligations set forth in a schedule and including: Liability of Standard Steel Car Company and any of its Liquidating Subsidiary Corporations for pensions to employees, including Life Members and Definite Period Members (estimated) $350,000 Standard had never adopted any pension plan for its employees or those of its subsidiaries, nor prior to February 5, 1930, had it set up any reserve for pensions, though prior to that time it had paid monthly pensions to certain of its retired employees. In 1929 the amount of such payments, $42,159.04, was charged against an account entitled "Reserve for Federal Taxes and Contingencies." On February 5, 1930, prior *86 to the transfer to Securities, Standard set up a $350,000 reserve for pensions; and after the transfer Securities set up a $350,000 reserve for pensions and continued to pay and to charge to the reserve for pensions the monthly pensions instituted by Standard and other monthly pensions to certain former employees of Standard or its subsidiaries. About March 1, 1930, and pursuant to plan of reorganization between Standard and Pullman, Incorporated (sometimes hereinafter called Pullman), substantially all of Standard's remaining assets were transferred to Standard Steel Car Corporation, which was wholly owned by Pullman, Incorporated; and Standard ceased to do business on March 1, 1930, distributing in complete liquidation to its stockholders 560,000 shares of Pullman, Incorporated, received in the reorganization, and about $6,000,000 in cash, received from Pullman. After the reorganization Pullman had outstanding 3,873,973 shares of stock. In December 1933 certain assets of Securities were transferred to Standard Securities Corporation, then organized for the purpose of receiving and liquidating said assets, in exchange for 280,000 shares of Stancar stock. Securities then distributed *87 the stock pro rata, and its remaining assets in complete liquidation, and dissolved. The transfer by Securities to Standcar was made subject to the indebtedness, liabilities, and obligations of Securities, as set forth in a schedule, which included: Liability of Standard Car Securities
Company for Pensions (estimated)
$ 168,601
Liability of Standard Car Securities
Company for Pension Fund (esti-
mated)
$1,000,000
Standcar set up reserves accordingly of $168,601 for pensions and of $1,000,000 for pension fund. Up to February 5, 1935, Standcar, pursuant to action by its board of directors, continued to pay the monthly pensions theretofore authorized and other monthly pensions to certain former employees of Standard or its subsidiaries and to charge such payments to the reserve for pensions. On February 4, 1935, the stockholders of Standcar adopted a resolution with reference to the reserve for pension fund, the reserve for pensions, and the reserve for contingencies. The president, Mr. Drake suggested the three reserves be consolidated into one. After reciting, inter alia, and in pertinent part, that in the reorganization between Standard and Pullman, Standard's *88 stockholders received a share of stock in Securities for each share of their Standard stock, and that Securities was formed to liquidate Standard assets not taken over by Pullman, and to provide for pensions and gratuities to former employees of Standard and its subsidiaries; and reciting the merger between Securities and Standcar, the setting up of a reserve for contingencies and a reserve for pensions by Securities, and the assumption of the liabilities of Securities by Standcar, including such reserves, and the fact that certain sums remained in the reserve for pensions and in the reserve for contingencies, it was resolved that the action of the officers and directors in assuming and setting up the reserves "for pensions and gratuities for the benefit of former employees of Standard Steel Car Company and its subsidiary companies and/or contingencies" and "payments to or in the nature of a pension or a gratuity that have heretofore been made" and charged to the reserves, are ratified and approved; and that there be set up on Standcar's books, as of January 31, 1935, a "reserve for pensions and gratuities" made up by the transfer of funds from the reserve for pension fund, from the *89 reserve for pensions, and from the reserve for contingencies; and that the board of directors of Standcar are authorized to "continue such pension and/or gratuitous allowances as they have heretofore made, and to grant other and further pensions and/or gratuitous allowances" to or for the benefit of former employees of Standard and its subsidiary companies. The reserve for contingencies referred to in the resolution did not at any time have anything to do with pensions; but there were charged to the reserve for contingencies certain terminal pay payments to former employees of Standard, or its subsidiaries, designated retirement allowances. On April 18, 1935, the directors of Standcar resolved that the president be authorized to grant such gratuitous single payment allowances to former employees of Standard and its subsidiaries who had a minimum service of ten years with that company or its subsidiaries, as to him seemed fitting and proper "within the limitation of the following schedule based on years of service" to Standard or its subsidiaries or successors. The schedule is: Under 10 years of employment
nothing
10 to 15 years of employment
equivalent of 2
months salary
15 to 20 years of employment
equivalent of 4
months salary
20 to 25 years of employment
equivalent of 6
months salary
25 to 30 years of employment
equivalent of 9
months salary
*90 In August 1939 Standcar transferred to Finance, its wholly owned subsidiary, certain of its assets, including the balance in the reserve for pensions and gratuities created by Standcar's stockholders on February 4, 1935; and Standcar was thereupon liquidated and dissolved in September 1939. Its stockholders each received 1/280ths of a share of stock of Finance. The terms of the transfer from Standcar to Finance, set forth in letter dated July 25, 1939, were, in pertinent part, as follows: Standcar transferred its "reserve for pensions and gratuities fund * * * originally set up * * * by virtue of a resolution of the stockholders * * * adopted * * * February 4, 1935, (quoting the language hereinabove quoted from the resolution of February 4, 1935, as to continuation of pensions and/or gratuitous allowances made by the directors and to grant other and further pensions and/or gratuitous allowances to former employees of Standard or its subsidiaries) subject to the conditions that Finance set up a reserve for pensions and gratuities in the amount of the fund transferred to it; that it adopt as a plan for gratuitous allowances substantially the plan adopted by Standcar's directors on *91 April 18, 1935, (quoting as to the power of the president to grant allowances, the language hereinabove set forth from the resolution of April 18, 1935, and quoting the schedule above set forth); that "any gratuitous allowances that do not come within such schedule" and "any allowances of pensions" be "made only by the authority of the board of directors" of Finance; that Finance continue the payment of pensions already granted, all subject, however, to the right in Finance's board of directors to alter, amend, change, or discontinue this schedule of gratuitous allowances, to change the amount of, or to discontinue any pension already granted, or later granted, and to discontinue the entire plan for pensions and/or gratuitous allowances, and to return to or place any unexpended balance in the reserve for pensions and/or gratuties to Finance's surplus account. Stockholders of Standcar Securities Corporation at a meeting on August 21, 1939, at which there were present in person or by proxy, 256,475 shares out of 280,000 shares outstanding, voted unanimously to approve and ratify the action of the board of directors of Standcar Securities Corporation taken at its meeting on July 25, 1939, with *92 respect to the transfer of the reserve for pensions and gratuities and certain other assets of Standcar Securities Corporation to Standard Car Finance Corporation. After the adoption on February 4, 1935, by Standcar's stockholders of the above resolution, Standcar and its successor, Finance, continued to pay certain monthly pensions theretofore authorized by the directors of Standcar or its predecessor, Securities, to certain former employees of Standard or its subsidiaries, and after the adoption of the resolution of February 4, 1935, and up to October 16, 1942, Standard and its successor, Finance, paid monthly pensions to other former employees of Standard or its subsidiaries, authorized by the directors of Standcar or Finance. All such payments were charged to reserve for pensions and gratuities. No such pension was paid to Wright. All such monthly pensions were terminated by action of Finance's directors at a meeting on October 16, 1942, hereinafter mentioned. After the adoption on April 18, 1935, of the resolution by Standcar's directors, and prior to October 30, 1942, Standcar and its successor, Finance, paid certain single payment allowances to certain former employees of *93 Standard or its subsidiaries and charged such payments to the reserve for pensions and gratuities established by the stockholders' resolution of February 4, 1935. No such pension was paid to Wright. On October 16, 1942, the directors of Finance held a meeting, the minutes of which, in pertinent part, were: That the president stated that the meeting was to consider the matter of distribution and final disposition of the reserve for pensions and gratuities; that a study had been made as to gratuitous lump sum payments to be made in lieu of pensions theretofore granted and for other gratuitous payments to former employees of Standard or its subsidiaries. Thereupon certain directors submitted two lists, one of lump sum payments to be made in lieu of pensions that had been granted, and the other of gratuitous allowances or payments. Thereupon it was resolved that the treasurer be authorized and directed to pay out of the reserve for pensions and gratuities to the following named former employees, and/or their widows, of Standard and/or its subsidiaries the amounts set opposite their names "as gratuitous allowances or gifts" (after which follows a list of 117 names, including the name *94 of Charles W. Wright with $19,500 set opposite his name). It was also resolved that the treasurer be authorized and directed to pay out of the reserve for pensions and gratuities to a list of former employees (their widows or executors or administrators) of Standard and/or its subsidiaries to whom pensions had been theretofore granted, and "as gratuitous allowances or gifts in lieu of such pension payments after October 31, 1942," certain amounts of money; and that the treasurer transfer to paid-in surplus the balance of the reserve for pensions and gratuities, after making such payments. The directors of Finance also, on October 16, 1942, adopted a plan of liquidation, which plan was also adopted by the stockholders on December 3, 1942. Pursuant to the resolution of the directors of Finance on October 16, 1942, $19,500 was paid to Charles W. Wright and charged against the reserve for pensions and gratuities. The check of Finance to Wright was accompanied by a notice, in effect, that it had been voted on October 16, 1942, "to make certain gratuitous allowances or gifts to certain former employees of Standard Steel Car Company or its subsidiaries" and that counsel considered it a *95 close question whether the amount was taxable income to Wright, under , and that it was recommended that Wright consult his own attorney on the question. Finance did not claim any deduction for Federal income tax purposes for the amounts paid, including the $19,500 paid Wright and no such deduction was allowed. In 1929 Standard deducted in its income tax return the $42,159.04 pensions paid by it as above recited and the deduction was allowed. In 1930 Standard likewise deducted $40,841.20 and the deduction was allowed. Securities deducted and was allowed $53,962 in 1931 and $43,538.80 in 1932, but the deductions for 1931 and 1932 were not allowed. After 1932 no deductions were taken in income tax returns for pensions or gratuities paid by Securities, Standcar, or Finance. Petitioner had no understanding, contract, or agreement with Standard Steel Car Company, Standard Car Securities Company, Standcar Securities Corporation, or Standard Car Finance Corporation, or any of its stockholders, directors, or officers, with respect to the $19,500 received by him in October 1942. J. Frank Drake was president of Standard Steel Car Company *96 from 1923 until the sale to Pullman, Incorporated, in 1930, and president of Standard Car Securities Company, Standcar Securities Corporation, and Standard Car Finance Corporation at all times here involved; and was a member of the board of directors of all such companies. He is now president of Gulf Oil Corporation. He took part in the transaction between Standard Steel Car Company and Pullman, Incorporated, on March 1, 1930. The transaction was a good one for the stockholders of Standard Steel Car Company. They received a very good price for their property. Pullman, Incorporated, and its subsidiaries never had any stock interest in Standard Car Securities, Standcar Securities, or Standard Car Finance Corporation. Drake was present at the directors' meeting of Standard Car Finance Corporation on October 16, 1942, at which the resolution was adopted to make payments to a list of 117 former employees of Standard Steel Car Company or its subsidiaries, including Wright. Drake regarded the payments to the 117 men as outright gifts, because the 117 men had never received pensions like some others who were on pension, because of retirement due to old age or illness, or incapacity, while *97 the payments to the 117 men had nothing to do with retirement because of age or incapacity. Drake did not participate in the payments. The Mellon family were the majority and controlling stockholders of Standard Steel Car Company, Standard Car Securities, Standcar Securities, and Standard Car Finance. W. L. Mellon, R. K. Mellon, T. H. Gillespie, William Bierman, and Max Epstein were directors from about January 1930 to about January 1934. Directors of Standcar Securities Corporation from 1933 to 1939 were Drake, R. K. Mellon, W. L. Mellon, Gillespie, Bierman, A. M. Scaife, and Max Epstein. The same men, with Adolph Schmidt and E. B. Clarke, were directors of Standard Car Finance Corporation from 1939 to 1942, though R. K. Mellon, Scaife, Clarke, and Schmidt served only part of that period. The amount of $19,500 paid to petitioner, pursuant to the foregoing resolution, was equal to nine months' salary at the rate paid to him at the time of the termination of his employment by Steel Car Forge Company. Opinion The only issue presented here is whether the $19,500 which the petitioner received from Finance in October 1942 was gift, or compensation for past services. The same question *98 has been considered in the case of Bert P. Newton and Edna R. Newton, 62, (promulgated September 30, 1948), and which was consolidated with this case for trial and briefing, though separate opinions are issuing. We there concluded and held that gift, not compensation, was represented by the amount received. The facts here are in the main the same as there, all of the facts with reference to the organization of the various companies, the stockholding therein, and the payments made (except as to amount) being identical with those hereinabove set forth, with this exception: Though not applying in the Newton matter, the schedule of years of service, set forth in Standcar's directors' resolution of April 18, 1935, and the letter of July 25, 1939, from Standcar to Finance, was such as to apply to Wright, since on March 1, 1930, he had been employed by Standard for more than 10 years, and the $19,500 paid him was equal to nine months salary at the rate paid him at the time his employment with Standard terminated. He had at that time been employed by Standard for more than 25 years. Therefore it can not be said that the fact of payment according to a schedule is altogether *99 inapplicable in Wright's case. Nevertheless, we do not regard such fact as of sufficient weight to cause a different conclusion here. It seems obvious that gifts could be according to a schedule, as well as compensation, and that it was a schedule based on length of service would not mean that service was paid for. Moreover, under the terms of Standcar's directors' resolution of April 18, 1935, the schedule was binding only on the president of the corporation, and the letter of July 25, 1939, repeats the idea, authorizing only the president to grant the gratuitous allowances within the limitation of the schedule; and specifically providing that any gratuitous allowances not within the schedule be made only by authority of the directors - and the directors it was who authorized the payment here involved, on October 16, 1942. Thus we see that the schedule has really little or nothing to do with the present question. The directors had power to make payments regardless of schedule. They had power to make any changes they desired in the whole matter of payments, to discontinue it, and to place the fund in the corporation's surplus, and this they did after the payments were made, on October 16, 1942, and *100 Finance was liquidated. Such power in those who made the payment here involved is inconsistent with a concept that they were paying compensation. In this case the petitioner continued, after March 1. 1930, in the employ of Pullman, the purchasing company, or its subsidiaries, a fact not true in the Newton case. We think the distinction fails to indicate a different result. The stockholders of Standard, it is true, obtained 560,000 shares of Pullman stock in the reorganization in 1930, but this was only a very small percentage of Pullman's 3,873,973 shares and we would not be justified in holding that such percentage, after the long lapse of time before the payments here concerned, would influence the stockholders of Finance in making the payments to a Standard employee. The record indicates that no attempt was made to limit payments only to those Standard employees who went with Pullman. The respondent indeed does not raise the point. We think it is not necessary to repeat here in full the discussion, set forth in the Newton case, of reasons for concluding that there was, in the payment made, gift and not compensation for past services. Finding here, as above stated, no essential *101 distinction in facts, from those in the Newton matter, we hold the same here, considering , also controlling here. Thereunder the mere fact that stockholders of Finance, the paying corporation, had benefitted by past services of the recipients "by no means" contradicts gratuity. Obligation to recipients is material, yet here there was none. Though a "liability" was mentioned in the transfer to Securities, and to Standcar, it was only for pensions and pension fund, and Wright was never a pensioner. Deduction was not attempted after 1932 for amounts paid out, so previous deduction carries no weight here, against the material and important fact that in the taxable year here involved there was none. The stipulation relied on in the Bogardus case we consider to indicate no distinction from this one, for it can not reasonably, with its context, be given the breadth desired by the respondent - a meaning which would have rendered useless the litigation which continued in the Bogardus matter. That the "gift or honorarium" in the Bogardus matter was soon after the termination of employment by Universal, the old corporation, while here payment *102 was made 12 years later out of a reserve and according to a custom of paying, indicates to us no sound distinction from the Bogardus situation. The intention, the Court said in the Bogardus case, must govern. Here we think the intent was to make gifts. Payment from a reserve here while from a surplus there, is immaterial. The directors here had power to throw the reserve fund into surplus, and did so in 1942, thus indicating the complete power of the directorship and how dependent the whole matter was on their intent. That there was recognition of past loyal services is, under the Bogardus theory, merely a reason for making the gift, which is none the less a gift because of gratitude for past faithful service. We see nothing more in the facts in this case, and unless we are to contradict the Supreme Court in that regard, we are constrained to hold here that there was gift. The expressions, considered weighty by that Court, are that there was gratuitous payment or gift, and Drake, the disinterested officer largely in control of the matter, regarded the payments as gifts as distinguished from pensions or retirement payments. The reasons expressed by him, that the deal in 1930 was "a *103 perfectly splendid thing for the stockholders" of Standard, "exceedingly favorable," that they got a good price, and that the purpose was to make gifts, is parallel to the reasons for gifts, sustained in the Bogardus case. That case must, so far as we are concerned, be regarded as the law despite . The payments were made by stockholders, authority not merely directors. Therefore, , and similar cases do not here apply. We apply the Bogardus case and hold that there was gift and not past service compensation. Decision of no deficiency will be entered for the petitioner.